United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

       Plaintiff,

       v

STEFAN WATHNE,

       Defendant.

_____/

No   CR 05-0594 VRW

MEMORANDUM OF DECISION

Stefan Wathne was indicted on one count of conspiracy to launder the profits from a LSD operation and now makes three motions.  He moves for discovery ancillary to a motion to dismiss based on a speedy trial violation resulting from the two years and six days that passed between his indictment and his arrest.  Doc #40.  Defendant also moves for dismissal on the ground that the prosecutor engaged in prosecutorial misconduct by failing

**United States District Court**
For the Northern District of California

adequately to inform the grand jury of the context in which witness testimony was obtained during interrogations in Russia.  Doc #42. Finally, defendant moves to dismiss under rights he retained from an agreement he made with the government concerning an extradition treaty between the United States and the Republic of India ("extradition treaty").  Doc #35.  Defendant argues that because his extradition from India would have violated the treaty's "dual criminality" requirement, the indictment should be dismissed.

For the reasons that follow, the court DENIES the motion to dismiss for prosecutorial misconduct and DENIES the motion for discovery ancillary to a motion to dismiss for a speedy trial violation.  With regard to defendant's motion to dismiss the indictment for an extradition treaty violation, the court finds that, under Indian law, extraditing defendant would have violated the dual criminality requirement.  The remedy for violation of the dual criminality requirement is not, however, clear.  For that reason, defendant's motion under the extradition treaty remains under submission pending further proceedings.

I

Defendant is an Icelandic citizen and Russian resident charged in a one-count indictment returned on September 15, 2005 for conspiring to launder money in violation of 18 USC § 1956(h). See Doc #1 at 1; Doc #20 at 7–8.  The indictment alleges that between spring 1996 and November 2000, defendant conspired with an individual named William Leonard Pickard, among others, to launder the illegal proceeds of a LSD manufacturing operation.  Doc #1 at 3–5.

The indictment was the result of an investigation led by various government entities, including the United States Attorney's Office for the Northern District of California ("USAO"), the Drug Enforcement Administration ("DEA"), the Internal Revenue Service ("IRS") and various foreign governments.  See Doc #21-11 Exh 10 at 3.

On April 21, 2003, the Department of Justice submitted a request to the Russian Procurator General pursuant to a bilateral treaty between the United States and Russia known as a mutual legal assistance treaty ("MLAT").  See Doc #39-8 Exh 3 at 3.  The MLAT request asked the Procurator General, among other things, to interview defendant and one of defendant's business associates, an individual named Igor Beskrovny.  Doc #39-11 Exh 6 at 3.  In particular, the MLAT request focused on various financial transactions in which, the government alleges, defendant repatriated $140,000 of illegal proceeds from Pickard's LSD manufacturing operation back to Pickard in the form of "donations" to support Pickard's research program at the University of California, Los Angeles.  Doc #47 at 3.  The MLAT request also asked the Procurator General to allow an Assistant United States Attorney ("AUSA") and agents from the DEA and the IRS to participate in the interviews in Russia.  Doc #47 at 3.  The Procurator General granted the MLAT request in its entirety.  See Doc #39-10 Exh 5 at 3.

Pursuant to the MLAT, Russian and United States officials summoned and interrogated defendant, Beskrovny and another witness, Rachid Usupov, in 2003 and 2004.  See Doc #47-2 Exh 3 at 12-13, 22.  The officials interviewed Beskrovny twice, both times in the

United States District Court
For the Northern District of California

3

presence of Russian and United States officials, including DEA agent Karl Nichols. See Doc #47-2 Exh 3 at 12-13. The first Beskrovny interview lasted eight hours and included a two-hour break to allow Beskrovny to leave unaccompanied for lunch. Doc #39-18 Exh 12 at 3, 7. Beskrovny told investigators that he had smuggled approximately $35,000 in cash from New York to Moscow on one occasion, at defendant's insistence. Doc #39-18 Exh 12 at 8. Beskrovny also stated that defendant had instructed him to prepare two letters containing donations, the first letter relating to a donation of $70,000 to the University of California where Pickard was working at the time, the second letter relating to a donation of $100,000 to the Harvard University School of Medicine, "to assist Leonard Pickard." Doc #39-18 Exh 12 at 9.

Beskrovny's second interview took place about four months after the first interview. Doc #39-11 Exh 6 at 2. The second interview lasted for five hours and twenty minutes, including a one-hour unaccompanied luncheon break. Doc #39-11 Exh 6 at 3. During the second interview, Beskrovny supplied more details about the letter he prepared, at the instruction of defendant, to aid Pickard's research programs. Doc #39-11 Exh 6 at 5-10. During both interviews, the interviewing officers informed Beskrovny of his rights under Russian law. Doc #39-18 Exh 12 at 4; Doc #39-11 Exh 6 at 5-10.

On September 15, 2005, DEA Agent Nichols testified before the grand jury. Doc #47-2 Exh 3. Agent Nichols testified about numerous statements made by witnesses in the course of the investigation, including statements made by Beskrovny during two interviews. Doc #47-2 Exh 3. Agent Nichols explained to the grand

**United States District Court**
For the Northern District of California

4

**United States District Court**
For the Northern District of California

jury that the Beskrovny interview occurred in Russia with both Russian and United States officials present, but did not elaborate on the Russian legal system or the rights under Russian law afforded to witnesses being interrogated.  Doc #47-2 Exh 3 at 13. After Agent Nichols testified, the grand jury returned the present indictment.

The arrest warrant for defendant remained sealed until December 12, 2005, when it was unsealed for the limited purpose of distributing it to foreign law enforcement officials.  Doc #39-21 Exh 14 at 2.  On April 18, 2006, following an application from the DEA, Interpol agreed to publish a Red Notice to its member countries for defendant's apprehension.  Doc #49-2 Exh 1 at 2. Agent Nichols spoke with attorney Betsy Burke of the Department of Justice Office of International Affairs ("OIA") about the possibilities for extraditing defendant from Russia on June 12, 2006.  Burke advised Agent Nichols that because the United States and Russia do not have a formal extradition treaty, options for returning defendant to the United States were limited to "(1) extraditing via the UN Drug Convention; (2) having the Russian authorities prosecute [defendant] for the indicted crimes; or (3) getting the Russian authorities to deport [defendant] to a more extradition friendly state."  Doc #39-28 Exh 20 at 2.

On July 17, 2006, Interpol published the warrant, which stated:  "Extradition will be requested from any country with which the requesting country is linked by a bilateral extradition treaty, an extradition convention or by any other convention or treaty containing provisions on extradition."  Doc #49-2 Exh 2 at 5.

**United States District Court**
For the Northern District of California

On September 21, 2007, defendant was arrested upon landing at Indira Gandhi International Airport in New Delhi, India, pursuant to the Interpol Red Notice authorizing his arrest on the outstanding indictment in the United States.  Doc #48-2 Exh 1 at 2. Immediately, defendant moved for bail on the ground that his detention was unlawful because the crime with which he was charged was not an extraditable offense.  Doc #39-40 Exh 28 at 4.

On September 25, 2007, the United States Embassy in New Delhi requested that the Indian government detain defendant pending a formal extradition request.  Doc #48-2 Exh 1 at 2-3.  The Indian government complied with the request for defendant's provisional arrest.  Doc. #35 at 9.  An Indian court denied bail on October 15, 2007 on the ground that it could not adjudicate the issue of dual criminality until the United States filed a formal extradition request.  Doc #48-3 Exh 3 at 6.  Defendant petitioned for a writ of habeas corpus based on the dual criminality argument on October 20, 2007.  Doc #39-43 Exh 31 at 7.

On October 17, 2007, the parties began negotiating an agreement for defendant to waive or consent to extradition.  Doc #48-4 Exh 4, 5.  On October 31, 2007, counsel for defendant and the government appeared before Magistrate Judge Edward M Chen of the Northern District of California to request approval of an agreement whereby defendant would consent to extradition to the United States in exchange for the government's agreement to release defendant on bond upon arrival in the United States.  The agreement also provided that defendant "maintains his rights under the extradition treaty to not have the charges enlarged upon * * * ."  Doc #48-4 Exh 6 at 11-12.  On November 14, 2007, the government submitted a

formal extradition request to the government of India.  Doc 48-4 Exh 9 at 25.

On November 15, 2007, the High Court of Delhi at New Delhi issued an initial order granting defendant's motion for bail and addressing his habeas petition.  On the dual criminality issue, the court stated:  "Prima facie there seems to be substance in the plea of the learned counsel for petitioner in view of the position of law laid down by the Hon'ble Supreme Court and the plain reading of Article 20 of the Extradition Treaty and we are of the view that this matter requires to be addressed at the final hearing."  Doc #39-47 Exh 33 at 11.  The final hearing was scheduled for November 29, 2007, but subsequently was postponed until December 11, 2007.  Doc #39-48 Exh 34; Doc #39-49 Exh 35.

On December 7, 2007, the government withdrew its extradition request pursuant to an agreement it had reached with defendant ("voluntary return agreement").  Doc #48-4 Exh 9 at 26.  The voluntary agreement was formalized in a letter dated December 10, 2007, in which defendant agreed "voluntarily [to] return to the United States * * * on the condition that the United States agrees that he shall retain any and all rights he may have possessed under the Extradition Treaty between the Government of the United States and the Government of the Republic of India had the United States Government pursued its extradition request in the Republic of India."  Doc #39-51 Exh 37 at 2.

As a result of the government's withdrawal of the extradition request, the High Court of Delhi on December 13, 2007 issued an order dismissing further extradition proceedings as "infructuous."  Doc #48-4 Exh 9 at 27.  Defendant flew to the

United States District Court
For the Northern District of California

United States on January 3, 2008 and was arraigned in Newark, New Jersey.

II

Defendant renews his motion for discovery ancillary to a motion to dismiss for a speedy trial violation that he made on February 28, 2008.  Doc #20.  In particular, defendant sought, among other things, discovery relating to an alleged speedy trial violation based on the lapse of two years and six days between the date of the indictment and the date of defendant's arrest in India. Id.  Defendant argued that the government should have (1) attempted to extradite him during his years in Russia and (2) reassigned the case to a new prosecutor after the original prosecutor left the office in February, 2007.  Id.

At a hearing on May 1, 2008, this court denied defendant's motion with respect to the speedy trial violation without prejudice on the ground that defendant had not established "that the government could have secured defendant's return to the United States during the period following his indictment but before his arrest in India in September, 2007."  Doc #30 at 31.

The parties agree that the United States and Russia do not have a bilateral extradition treaty, but defendant argues that the government could and should have sought to extradite defendant under the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("UN Drug Convention"). Doc #40 at 14-15.  Defendant contends that the government learned that it could proceed via the UN Drug Convention during a June 12, 2006 phone call with OIA, but did not pursue that recommendation.

**United States District Court**
For the Northern District of California

See Id at 14-16; #39-28 Exh 20 at 2.  Moreover, defendant argues that the government never formed the required belief that extradition from Russia was futile during the time before defendant's arrest, regardless of the government's post hoc explanations.  Doc #40 at 16.  Accordingly, defendant requests discovery of (1) communications between the United States and Russia relating to defendant during the time period between defendant's indictment and arrest, (2) evidence that Russia assisted or refused to assist the United States to obtain defendant's return, (3) evidence that Russia assisted or refused to assist the United States to obtain the return of other defendants between 1997 and 2007, (4) evidence that the United States made an effort to inform defendant of the pending charges prior to his arrest and (5) evidence not already on the record that the government took steps to obtain defendant's presence for trial.  Id at 16-17.

The government responds that seeking extradition via the UN Drug Convention would have been futile because, "while in theory the United States could have requested Russia to extradite defendant under the UN Drug Convention, in practice any such request would have been denied."  Doc #49 at 4.  Accordingly, the government argues that defendant has not met his burden of establishing that the government could have secured defendant's return to the United States while he was in Russia.

In the Ninth Circuit, "where our government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so."  <u>United States v Corona-</u>

**United States District Court**
For the Northern District of California

_Verbera_, 509 F3d 1105, 1114 (9th Cir 2007).  Because there is no evidence that defendant traveled outside of Russia between the time he was indicted in 2005 and the time he traveled to India and was arrested there in 2007, defendant's motion rests on whether the government had a good faith belief supported by substantial evidence that requesting defendant's extradition from Russia was futile.

Defendant effectively established that the government had a legal basis to request extradition from Russia under the UN Drug Convention.  See Doc #40 at 14–15.  Professor Cherif Bassiouni testified as an expert witness for defendant, who characterized Bassiouni as author of "the" book on extradition law.  When asked whether the United States could have relied on the UN Drug Convention to obtain defendant's extradition from Russia, Professor Bassiouni responded, "[w]ell, the US could have relied on the treaty to make the request; whether Russia would have conceded it is another matter."  Reporter's Transcript of Proceedings, _United States v Stefan Wathne_, No CR 05-0594 VRW, *97 (ND Cal Aug 12, 2008) ("Hearing Transcript, Aug 12, 2008").

And therein lies the problem.  Based on the evidence presented, it appears quite unlikely that an extradition request to Russia would have been fruitful.  According to a declaration by Clifton M Johnson of the State Department, pursuant to a Senate resolution of advice and consent to the ratification of the UN Drug Convention, "the United States cannot extradite someone to another country by relying solely on the UN Drug Convention as the legal basis."  Doc #49-2 Exh 3 at 9, citing S Exec Rep No 101–15, at 115 (1989).  The State Department declaration contains the unsurprising

assertion that "[b]ecause the United States does not use this convention as a basis to extradite individuals to Russia, Russia in turn will not use the convention as a basis to extradite to the United States."  Doc #49-2 Exh 3 at 9.  The State Department also declared that, since becoming a party to the UN Drug Convention, Russia has not extradited anyone to the United States under any treaty despite several requests from the United States.  Id.

Defendant argues that the futility of an extradition request to Russia is a post hoc rationalization for negligent inattention on the part of the government.  See Doc #50 at 6.  But the "government negligence" explanation is contrary to the weight of the evidence in the record.  Between defendant's indictment and arrest, Agent Nichols coordinated efforts with the United States Marshals Service, Interpol, the National Crime Information Center, the OIA and the USAO, among other agencies, to secure defendant's return.  See Doc #20 Exh 14; Doc #21 Exh 15.  Moreover, it appears that the government considered the difficulties attendant to extraditing defendant from Russia.  A September 17, 2007 investigation report stated that, "[a]ccording to [OIA], there is currently no formal extradition process/treaty between the United States and Russia.  Therefore, unless [defendant] is captured in a country where there is an extradition policy in place, efforts to secure [defendant] are unlikely to succeed."  Doc #39-22 Exh 15 at 2.  And finally, the fact that defendant was immediately apprehended upon arrival at the New Delhi Airport suggests that the government was diligently seeking his arrest, especially considering that there is no other evidence in the record of

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   defendant leaving Russia between his indictment and his arrest.

2   See Doc #39-29 Exh 21 at 2.

3        Because the government did appear to have had a good

4   faith belief that attempting to extradite defendant from Russia

5   would fail, and because that conclusion was supported by

6   substantial evidence including the clear unprecedented nature of

7   such an extradition, the motion for discovery ancillary to a motion

8   to dismiss for a speedy trial violation is DENIED.

9

10                                    III

11        Defendant next moves to dismiss for prosecutorial

12  misconduct.  Defendant presented evidence that Russian law

13  enforcement officers "routinely" coerce confessions from suspects

14  and witnesses using various methods of threats and intimidation.

15  See Hearing Transcript, Aug 12, 2008 at *111-12; Doc #43.

16  Defendant also provided a declaration from Beskrovny explaining

17  that he understood that if he refused to answer the questions of

18  the Russian and United States officers who interrogated him, he

19  could be fined or imprisoned.  See Doc #54.  Defendant argues that

20  because Beskrovny and Usupov were interrogated under these

21  conditions in Russia, their testimony was "clearly coerced."

22  Evidence of this coercion, defendant continued, should have been

23  provided to the grand jury when Agent Nichols testified about

24  Beskrovny and Usupov's statements.  Accordingly, defendant seeks

25  dismissal of the indictment on grounds of prosecutorial misconduct.

26        In presentations to a grand jury, the government has a

27  duty of good faith.  United States v Basurto, 497 F2d 781 (9th Cir

28  1974).  Dismissal of an indictment may be proper when the "manner

United States District Court
For the Northern District of California

in which the prosecution obtained the indictment represented a serious threat to the integrity of the judicial process." <u>United States v Samango</u>, 607 F2d 877, 885 (9th Cir 1979).

Nevertheless, the court's role in policing grand juries is limited.  The court "will not interfere with the Attorney General's prosecutorial discretion unless it is abused to such an extent as to be arbitrary and capricious and violative of due process."  <u>United States v Welch</u>, 572 F2d 1359, 1360 (9th Cir 1978).  In <u>Bank of Nova Scotia v United States</u>, 487 US 250, 256 (1988) the Supreme Court stated, regarding prosecutorial misconduct, that "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  Moreover, prosecutors in grand jury proceedings have no legal obligation to present exculpatory evidence.  See <u>United States v Williams</u>, 504 US 36, 52 (1992); <u>United States v Isgro</u>, 974 F2d 1091 (9th Cir 1992).

In <u>United States v Samango</u>, 607 F2d 877 (9th Cir 1979), the Ninth Circuit affirmed the dismissal of an indictment for prosecutorial misconduct.  The court in <u>Samango</u> held that the cumulative effect of several prejudicial acts by the prosecutor served to bias the grand jury against defendant.  Id at 884.  The prejudicial acts included failing to warn the grand jury of the doubtful credibility of one of the witnesses, presenting misleading transcripts to the grand jury that "served no other purpose than calculated prejudice," not informing the grand jurors of their

13

1  rights to call witnesses and pressuring the grand jury to reach a

2  decision in a short amount of time.  Id at 880-884.

3        Defendant has not shown that the conduct of the

4  prosecutor here reaches the standard required for dismissal under

5  Samango.  First, while defendant presents evidence of severe

6  injustices in the Russian law enforcement system as a whole, there

7  is very little evidence of coercion of the witnesses who provided

8  testimony used in grand jury proceedings in this case.  Defendant's

9  motion relates to two witnesses — Beskrovny and Usupov – and

10  defendant provides details only about Beskrovny's interrogation.

11  Investigators compelled Beskrovny to answer questions for one

12  eight-hour period and one five-hour period.  Both sessions included

13  lunch breaks during which the witness was not accompanied by law

14  enforcement officials.  United States officials were present at

15  both interrogations.  The most serious allegation of Beskrovny's

16  declaration was that he "understood" that if he refused to give

17  statements, he could be "fined or imprisoned."  Doc #54 at 1.

18  Evidence of the broader problems within the Russian law enforcement

19  system as a whole is irrelevant if it did not infect Beskrovny's

20  statements.

21        Furthermore, there is little, if any, evidence on the

22  record suggesting that Beskrovny's statements, while compelled,

23  were not credible.  Beskrovny's declaration gives no indication

24  that his statements to the United States and Russian officials were

25  inaccurate.  Doc #54.  Given the detailed nature of Beskrovny's

26  statements about financial transactions, and a lack of any evidence

27  to the contrary, his testimony appears credible.  If Beskrovny's

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

statements are credible, then presenting them without providing
more background on his interrogation was not misleading.

Accordingly, defendant has not presented evidence of
prosecutorial misconduct.  Samango – which concerned a grand jury
proceeding that included misleading transcripts, a witness of
doubtful credibility, time pressure and a failure to instruct the
grand jury adequately – is inapposite. Samango, 607 F2d at 880-84.
The motion to dismiss for prosecutorial misconduct is DENIED.

IV

Defendant also moves to dismiss the indictment pursuant
to his rights under the voluntary return agreement.  The agreement
incorporates by reference Indian law, in that it invokes
defendant's rights under the United States extradition treaty with
India.

The right in question here is the dual criminality
requirement.  The United States and India entered into the
extradition treaty in 1999.  Pursuant to this treaty, the two
countries agreed "to extradite to each other, pursuant to the
provisions of this Treaty, persons who, by the authorities in the
Requesting State are formally accused of, charged with or convicted
of an extraditable offense * * * ."  Extradition Treaty, entered
into force on July 21, 1999, 1997 WL 602447.  Under the treaty, an
"extraditable offense" is defined as one "punishable under the laws
in both Contracting States by deprivation of liberty, including
imprisonment, for a period of more than one year or by a more
severe penalty."  Extradition Treaty, Art 2.  This requirement,
which is common in extradition treaties, is known as the

**United States District Court**
For the Northern District of California

requirement of "dual criminality."  See <u>United States v Khan</u>, 993 F2d 1368, 1372 (9th Cir 1993).

The voluntary return agreement implicates the right of dual criminality.  The agreement states that defendant retains "any and all rights he may have possessed under the Extradition Treaty had the US Government pursued its extradition request in the Republic of India."  Doc #39-51 Exh 37 at 2.  Defendant argues that his extradition would have violated the dual criminality requirement because the misconduct alleged – money laundering – was not a crime in India when the defendant allegedly committed it.  Moreover, because the Constitution of India's <u>ex post facto</u> provision would have prevented India from prosecuting defendant for his alleged offense, defendant argues that the dual criminality requirement bars extradition, even though money laundering is now a crime in India and was a crime at the time of the extradition request.  India Const, Art 20(1).  Defendant urges the court to dismiss the indictment.

The government raises two issues that would prevent the court from ruling on the meaning of the dual criminality requirement.  First, the government argues that under the terms of the voluntary return agreement, defendant had no right to raise a dual criminality defense.  Second, the government argues that ruling on the meaning of the dual criminality requirement would be "invading the sovereignty of the Indian government and the jurisdiction of the Indian court."  Doc #48 at 6.  The court rejects both arguments

//

//

**United States District Court**
For the Northern District of California

## A

The government acknowledges that defendant had a right to raise the dual criminality requirement before an Indian court, but the government contends that defendant waived that right when he entered into the voluntary return agreement.  The government invokes the language of the agreement and the communications between the government and defendant before the agreement, in advancing its waiver contention.

The government focuses on that part of the written agreement that states that defendant would "retain any and all rights he may have possessed under the Extradition Treaty between the Government of the United States and the Government of the Republic of India had the US Government pursued its extradition request in the Republic of India."  Doc #39-51 Exh 37 at 2.  The government continues:  "In other words, under the terms of the voluntary return agreement, the defendant should be treated by this Court as if he had consented to extradition to the United States."  Doc #48 at 10.

The problem with the government's contention is that the "other words" the government supplies are not synonymous with those of the agreement.  There is a distinction between defendant voluntarily returning and yet retaining any and all rights under the extradition treaty, on the one hand, and consenting to extradition and yet retaining his rights, on the other.  As the government would have it, consenting to extradition implies consenting to the prerequisites for extradition; namely, it implies consent to an Indian court's finding that the dual criminality requirement had been satisfied.  Doc #48 at 10-11.  But the

**United States District Court**

For the Northern District of California

agreement does not include the language "consent to extradition" and no such intent can be inferred from the agreement. The agreement requires that defendant voluntarily return to the United States, but reserves to him "any and all rights he may have possessed under the Extradition Treaty * * * had the US Government pursued its extradition request in the Republic of India." Doc #39-51 Exh 37 at 2. Had the United States pursued its extradition request in India, the main issue to be resolved was the issue of dual criminality. See Doc #39-47 Exh 33 at 11. The language "any and all rights" certainly encompasses the major issue pending at the time before the Indian court.

The government asserts that its interpretation is a reasonable bargain because defendant gave up his right to have an Indian court resolve his dual criminality argument in exchange for preventing the government from using the formal extradition process to secure his presence in the United States. Doc #48 at 11. But such an interpretation is highly strained given that defendant could have voluntarily returned to the United States even without the agreement. Extradition Treaty, Art 18 ("If the person sought consents to surrender to the Requesting State, the Requesting State may, subject to its laws, surrender the person as expeditiously as possible without further proceedings."). Given that the Indian court had already scheduled a hearing to rule on the dual criminality requirement, referred to defendant's claim as having "substance" and released defendant on bail, the right to invoke the dual criminality requirement seems to have been a significant right that defendant would not voluntarily have forfeited. Assuredly,

**United States District Court**
For the Northern District of California

defendant would have purposefully given up the opportunity to challenge extradition without receiving something in return.

As evidence to support its interpretation, the government points to its previous negotiations with defendant that referred to "consent to extradition" and focused on the right of "specialty" rather than on the dual criminality requirement. Doc #48-4 Exh 6 at 10-15. Evidence of these negotiations is not persuasive for two reasons. First, the actual language of the agreement – "any and all rights" – is as broad as can be. Second, the evidence the government points to all predates the Indian court's decision releasing defendant on bail and declaring that his argument about dual criminality has "substance." Doc #39-47 Exh 33 at 11. It is reasonable to assume that defendant's bargaining position and interests changed as a result of that decision, so evidence of an agreement considered before that time is not very helpful.

For the reasons above, the best interpretation of the voluntary return agreement is that it preserved, among other things, any right not to be extradited for a non-extraditable offense that defendant may have possessed under the extradition treaty.


**B**

The government argues that, even if defendant retains a right to assert the dual criminality requirement, this court does not have the authority to "reopen[] the Indian extradition case and decid[e], under Indian law, whether the crime would have been a crime in India, for dual criminality purposes." Doc #48 at 6. The government cites numerous cases for the proposition that

**United States District Court**
For the Northern District of California

"determination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested state." Doc #48 at 6, quoting <u>United States v Van Cauwenberghe</u>, 827 F2d 424 (9th Cir 1987). The government goes on to describe the December 13, 2007 decision by an Indian court as a "final decision" on extradition. In that decision, the Indian court dismissed extradition proceedings as "infructuous," or unfruitful, after parties entered into the voluntary return agreement and the government withdrew its extradition request.

The problem with the government's position is that the Indian court's December 13, 2007 order was not a final determination of the merits of any legal issue before the court today, but rather an administrative dismissal of the extradition issue as moot, due to the government's withdrawal of its extradition request. The only decision by an Indian court that even touched on the merits of extradition was the November 15 ruling by the High Court of New Delhi scheduling a further hearing because, in its judgment, "[p]rima facie there seems to be substance [in the dual criminality argument]." Doc #39-47 Exh 33 at 11. Because the government withdrew its request, there has been no decision about extradition by an Indian court on the merits, and there is no pending decision.

The government's incorrect characterization of the December 13, 2007 Indian court decision dooms the government's reliance on the cases it cites. All the cases cited by the government for the proposition that extradition decisions are under the sole purview of the extraditing countries involve final or pending extradition decisions on the merits by foreign courts.

**United States District Court**
For the Northern District of California

<u>Johnson v Brown</u>, 205 US 309 (1907) (refusing to overturn a Canadian commissioner's order, affirmed by Canadian court, ordering extradition); <u>United States v Campbell</u>, 300 F3d 202 (2d Cir 2002) (refusing to reopen a Costa Rican court decision to extradite); <u>Casey v Dep't of State</u>, 980 F2d 1472 (DC Cir 1992) (holding that United States district court had no subject matter jurisdiction over extradition decision because Costa Rican courts had held the defendant extraditable and a habeas petition was still pending before Supreme Court of Costa Rica); <u>United States v Van Cauwenberghe</u>, 827 F2d 424 (9th Cir 1987) (deferring to a Swiss court's grant of extradition); <u>McGann v United States Bd of Parole</u>, 488 F2d 39 (3d Cir 1973) (refusing to overrule a Jamaican court ruling as to extraditable nature of offense); <u>United States v Medina</u>, 985 F Supp 397 (SDNY 1997) (refusing to review a Dominican Republic court decision allowing extradition).    These cases stand for the proposition that where there is a final or pending decision on the merits of extradition in the country from which extradition is requested, a United States court should not disturb that decision.   That proposition rests soundly on principles of comity among nations.

Here, there is no foreign court ruling to disturb.   The Indian court did not rule on the merits of extradition, and there is no pending Indian court decision, because the United States withdrew its extradition request.   Accordingly, <u>Johnson</u> and its progeny do not preclude this court from ruling on defendant's rights under the extradition treaty.

//

//

C

Having addressed the government's two arguments in opposition to the court's reaching the dual criminality issue, the court must still examine that issue in order to enforce the voluntary return agreement between the government and defendant. In extradition treaties, the related doctrines of dual criminality and specialty are based on international comity and "serve primarily to protect the interests of the requesting and asylum states, not the interests of the extraditee." United States v Merit, 962 F2d 917, 920 (9th Cir 1992). Nevertheless, the Ninth Circuit has held that with respect to these extradition provisions, "the person extradited may raise whatever objections the rendering country might have." United States v Najohn, 785 F2d 1420, 1422 (9th Cir 1986), citing United States v Rauscher, 119 US 407, 419 (1886). Accordingly, under the extradition treaty at issue here, defendant may raise India's right to object to extradition if the charged offense violated the dual criminality requirement under Indian law.

The extradition treaty provides that the United States and India agree to extradite to each other persons charged with an "extraditable offense" by the "Requesting State." Extradition Treaty, Art 1. The dual criminality provision provides: "An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty, including imprisonment, for a period of more than one year or by a more severe penalty." Extradition Treaty, Art 2 ¶1.

Both defendant and the government agree that as of the date of the extradition request, money laundering was a

**United States District Court**
For the Northern District of California

sufficiently serious felony in India to satisfy the dual criminality requirement.  See Doc #48 at 5 (referring to Prevention Of Money Laundering (Amendment) Act, 2002, No 20, Acts of Parliament (2005); available at http://indiacode.nic.in); Doc #35 at 6 (same).  But money laundering was not a crime when the acts alleged in the indictment occurred - 1996-2000.  Doc #37 at 3-4; Doc #38 at 6-7.  Accordingly, the outcome of defendant's motion turns on whether the dual criminality requirement in India applies to the time of the conduct constituting the offense or the time of the extradition request.

Federal Rule of Criminal Procedure 26.1 provides that "[i]ssues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source, including testimony, without regard to the Federal Rules of Evidence."  F R Crim P 26.1.  As the Ninth Circuit recognized, addressing the nearly identical Rule 44.1 of the Federal Rules of Civil Procedure, "expert testimony accompanied by extracts from foreign legal materials has been and will likely continue to be the basic mode of proving foreign law."  Universe Sales Co v Silver Castle, Ltd, 182 F3d 1036, 1038 (9th Cir 1999).

The government offers no evidence on the issue of dual criminality under Indian law.  The only support the government provides for the interpretation that dual criminality is governed by the time the indictment is the suggestion that "defendant's interpretation would be rejected under American law."  Doc #48 at 5 n3.  Not only does that proposition not suffice to address the dual criminality requirement as a matter of Indian law, but it is also not adequately supported by the three cases the government cites.

**United States District Court**
For the Northern District of California

One case holds that a particular dual criminality provision of a different extradition treaty refers to the time of the extradition request and not the time of the conduct, but that particular holding resides in an eighty-one-year-old Second Circuit case that has never been followed.  See Doc #48 at 5 n3, citing <u>United States ex rel Oppenheim v Hecht</u>, 16 F2d 955 (2d Cir 1927).  The other two cases hold that extradition treaties can be retroactive in the sense that they can be used to extradite people for crimes committed before the extradition treaty came into effect, but they say nothing of conduct that was not criminal at the time of conduct in the country from which extradition is sought.  See Doc #48 at 5 n3, citing <u>Gallina v Fraser</u>, 177 F Supp 856, 864 (D Conn 1959); <u>Hilario v United States</u>, 854 F Supp 165 (EDNY 1994).

Defendant presented testimony of two experts on Indian law in support of his contention that dual criminality applies to the time of the alleged conduct.  Doc #35 13-18.  Y K Sabharwal, the former Chief Justice of India, and Raju Ramachandran, the former Additional Solicitor General of India, testified via video conference and presented declarations suggesting that, under Indian law, defendant could not have been extradited to the United States because of the dual criminality requirement.  Doc #38 at 15-16; Hearing Transcript, Aug 12, 2008 at *44.

The main arguments recited by defendant's experts are as follows.  First, defendant's indictment alleges that he conspired to commit money laundering between 1996 and 2000, but neither money laundering nor the conduct described in the indictment was a criminal offense in India during that time.  Doc #38 at 6-7; Doc #37 at 3-4.  Second, the Constitution of India contains an <u>ex post</u>

**United States District Court**

For the Northern District of California

facto clause that the Supreme Court of India has held must be given full effect.  Doc #37 at 4.   Article 20(1) of the Constitution of India provides:

> No person shall be convicted of any offense except for violation of a law in force at the time of the commission of the act charged as an offense, nor be subjected to a penalty greater than that which might have been inflicted under the law in force at the time of the commission of the offense.

Doc #53 Exh 39.   Third, both the extradition treaty and the similar language in its enabling legislation should be read in conformity with Article 20(1) of the Constitution of India and may not contravene that constitution.  Doc #38 at 7-10; Doc #37 at 4-5. Accordingly, in Sabharwal's words, "an Indian Court would interpret [the dual criminality requirement] to mean and include only those acts which were punishable in both countries on the date when the said acts were committed."  Doc #38 at 10.

Sabharwal testified that he did not believe the Supreme Court of India had ever confronted the question whether the relevant time period for the dual criminality inquiry was the date of commission or the date of the extradition request.  Hearing Transcript, Aug 12, 2008 at *49.  But both Sabharwal and Ramachandran cite a House of Lords opinion to support their contentions that an Indian court would look to the date of commission.  See Doc #38 at 10-12; Doc #37 at 5, citing Regina v Bow Street Metropolitan Stipendiary Magistrate and Others, Ex Parte Pinochet Ugarte (No 3), [1999] 2 WLR 827.  The House of Lords confronted the question of dual criminality in the context of the UK Extradition Act of 1989.  Id at 10.  Seven law lords held unanimously that the relevant date for the purpose of the dual criminality provision of that treaty was the date of the commission

**United States District Court**
For the Northern District of California

of the offense.  Id at 10-12; Doc #37 at 5.  As Sabharwal explains, while House of Lords opinions are not binding on Indian courts, they are often considered as persuasive authority where there is no controlling Indian law.  Doc #38 at 12.  According to Ramachandran, House of Lords opinions carry "great persuasive value" and <u>Ex Parte Pinochet Ugarte</u> "fortifies and supports" his view that the defendant would not have been extradited by an Indian court.  Doc #37 at 5.

Based on the testimony of Sabharwal and Ramachandran, as well as the Constitution of India, <u>Ex Parte Pinochet Ugarte</u> (the only persuasive authority presented on the subject by either party) and the government's lack of opposition, this court concludes that the dual criminality requirement of the extradition treaty under Indian law requires that the offense charged be punishable in both countries at the time of the conduct that constitutes the offense. Accordingly, had the government pursued extradition in India without the voluntary return agreement, an Indian court probably would have denied extradition on that basis.


IV

The question of remedy remains.  Defendant's motion calls for dismissal of the indictment, citing <u>United States v Khan</u>, 993 F2d 1368 (9th Cir 1993).  In <u>Khan</u>, the defendant was extradited from Pakistan under an ambiguous extradition order and then convicted in the United States on two counts.  <u>Khan</u>, 993 F2d at 1371.  Defendant successfully argued that the second count could not have been part of the ambiguous order, because it would have violated dual criminality under Pakistani law. <u>Khan</u>, 993 F2d at

**United States District Court**
For the Northern District of California

1372–73.  As a result, the conviction for the second count, which
violated the extradition treaty at issue, was reversed and
dismissed.  <u>Khan</u>, 993 F2d at 1374.

          This case is different from <u>Khan</u> because there is no
conviction to be reversed.  Dismissing defendant's indictment
would, of course, provide relief that an Indian could not afford
had the United States pursued its extradition request in India.  An
Indian court could merely have released defendant in India.

          A recent case in the Ninth Circuit, <u>United States v
Anderson</u>, provides a more appropriate remedy.  472 F3d 662 (9th Cir
2006).  <u>Anderson</u> explains that if "the transfer of the defendant
violated the applicable extradition treaty," the court is deprived
of jurisdiction over the extradited defendant.  <u>Anderson</u>, 472 F3d
at 666.  While defendant here was not extradited, the best way to
give effect to defendant's rights under the voluntary return
agreement, which incorporates by reference defendant's rights under
the extradition treaty, would appear to be to decline to exercise
jurisdiction over defendant for a sufficient period to allow
defendant to exit the United States.  If, of course, defendant does
not voluntarily remove himself from the United States he will be
deemed voluntarily to have consented to this court's jurisdiction.
Furthermore, defendant would run the risk of extradition upon
entering another country from which the government could seek his
arrest and, if arrested, his extradition.  Needless to say,
defendant's options may be quite limited.  But, dismissal of the
indictment is not appropriate.

//

//

27

**United States District Court**
For the Northern District of California

V

Defendant's motions to dismiss for prosecutorial misconduct, Doc #42, and for discovery ancillary to his speedy trial motion, Doc #40, are DENIED.

The parties shall be prepared to discuss the briefing of any issues that need to be addressed about remedies the court has outlined for violation of the dual criminality requirement at the hearing previously scheduled for September 25.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge